UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

MICKI HARRINGTON,          )
                               )
            Plaintiff,   )
                               )
                               )   CIVIL ACTION NO.
v.                       )   20-11718-DPW
                               )
                               )
LESLEY UNIVERSITY      )
& HEDI BENAICHA,       )
                               )
            Defendants.  )

MEMORANDUM AND ORDER
August 12, 2021

This case, which is now before me on a motion to dismiss, presents questions concerning the interplay between two separate federal statutory schemes that address gender discrimination: Title VII of the Civil Rights Act of 1964 ("Title VII"), Pub. L. No. 88-352, 78 Stat. 241, 253-266 (codified as amended at 42 U.S.C. §§ 2000e to 2000e-17), which prohibits employment discrimination because of "sex," among several protected classifications, and Title IX of the Education Amendments of 1972 ("Title IX"), Pub. L. No. 92-318, 86 Stat. 373 (codified as amended at 20 U.S.C. §§ 1681-1688), which, with singular focus, proscribes discrimination "on the basis of sex" in any federally funded educational program or activity.  An employee of a federally funded educational institution who alleges sex-based employment discrimination can come within the literal statutory

language of both federal statutes.

The fundamental question posed is whether Plaintiff Micki Harrington may bring employment discrimination claims against her current employer, Lesley University, and her former supervisor, Dean Hedi BenAicha, under both Title VII and Title IX.  I find that she may, subject to the constraints of the statutes of limitations proscriptions separately applicable to the two statutory schemes.[1]

<b>I. BACKGROUND</b>

**A.   *Factual Allegations***

Except where noted, the following facts drawn from the allegations of the operative First Amended Complaint are not in dispute for the purposes of the motion to dismiss.  To the extent that alleged facts are disputed, I view them in the light most favorable to Ms. Harrington, the non-moving party.  *See Ramírez-Lluveras* v. *Rivera-Merced*, 759 F.3d 10, 13 (1st Cir. 2014).

<u>1.</u>   <u>Sexual Harassment Allegations</u>

On or around August 22, 2016, Ms. Harrington began

---

[1] Also implicated is the separate state statutory scheme under the Massachusetts Fair Employment Practices Act, Massachusetts General Laws ch. 151B ("Chapter 151B"), proscribing sex-based discrimination as a form of unlawful employment discrimination. As explained more fully in this Memorandum, I find that the statute of limitations proscription applicable to the Massachusetts statutory scheme forecloses Ms. Harrington's claims under Chapter 151B.

employment in the position of Temporary Art Librarian with
Lesley University.  *See* First Amended Complaint ("FAC") ¶ 9
[Dkt. No. 12].  Lesley University is a higher education
institution providing federally funded undergraduate, masters,
and doctoral programs.  *Id.* ¶ 8.  Ms. Harrington reported
directly to the individual Defendant, Hedi BenAicha, the Dean of
University Libraries.  *Id.* ¶ 9.  Throughout this period, he
subjected Ms. Harrington to persistent verbal and physical
sexual harassment.  *Id.* ¶ 15.

Ms. Harrington alleges that, in every workplace meeting,
Dean BenAicha engaged in nonconsensual, sexualized physical
contact.  *Id.*  A few examples follow.

On or around July 18, 2017, he put his arm around her waist
without permission as they left a meeting on the University
campus.  *Id.* ¶ 16.  When she attempted to move away, he
tightened his grip.  *Id.*

In August 2017, he placed his hand on her back and traced
his fingers up and down her spine during a conversation with
another colleague on the University campus.  *Id.* ¶ 17.  He
repeated this nonconsensual physical touching in a staff meeting
two months later.  *Id.* ¶ 19.

On or around September 7, 2017, Dean BenAicha approached
Ms. Harrington at the circulation desk of the University library
and massaged her shoulders without consent.  *Id.* ¶ 18.  To

terminate the physical contact, Ms. Harrington had to stand up and move to a different chair.  *Id.*

In the same month, on or around September 7, 2017, Dean BenAicha learned that a visitor had exposed himself to Ms. Harrington in the library.  He intrusively asked her about the incident, inquiring: "How much did you see?" and "What did you think of it?"  *Id.* ¶ 24.  She had to walk away to end his sexually charged questioning.  *Id.*

While they were in the workplace, Dean BenAicha repeatedly told Ms. Harrington that he preferred she wear skirts to work instead of pants.  *Id.* ¶ 20.  He frequently referred to her as his "daughter."  *Id.*

On or around November 20, 2018, Ms. Harrington filed a complaint with the Title IX coordinator at Lesley University describing Dean BenAicha's sexual harassment and gender discrimination.  *Id.* ¶ 26.  Two weeks later, on or around December 4, 2018, Dean BenAicha took medical leave.  *Id.* ¶ 27. As of the filing of this litigation, he had not returned.  *Id.* The University has not issued any findings in response to the Title IX complaint.  *Id.* ¶ 28.

### 2.   Wage Discrimination Allegations

Prior to accepting employment with Lesley University as Temporary Art Librarian, Ms. Harrington had spoken to Dean BenAicha about the position.  *Id.* ¶ 11.  During this

conversation, he promised her that she would receive relocation benefits and guaranteed professional development funds as part of her compensation.  *Id.*  He also promised that, after a probationary period, she would be promoted to the permanent position of Head Librarian and would receive a raise in salary. *Id.*  Relying on these oral promises, Ms. Harrington terminated her employment of approximately eight years in the Library Department of Keene State College and, on August 22, 2016, she accepted employment with Lesley University. *Id.* ¶¶ 10, 11.

Around November 2016, the University transitioned her from a temporary employee to a salaried employee.  Her pay, however, actually decreased from $4,835.20 per month to $4,583.00 per month.  *Id.*

From 2016 through 2018, Dean BenAicha continued to promise Ms. Harrington that her promotion to Head Librarian – and a raise in salary – was imminent.  *Id.* ¶ 14.  For example, on or around September 5, 2017, at a faculty development day focused on diversity, he put his arm on the back of her chair and whispered in her ear that he knew she was dissatisfied with her pay and that he would fix her title and salary.  *Id.* ¶ 23.  He also told her, in response to the ongoing presentation on diversity, that inequity in the publishing field of academia is "normal" and not actually a problem.  *Id.*

Dean BenAicha continuously reported to Ms. Harrington that he was working diligently with Human Resources to finalize her promotion to Head Librarian. *Id.* ¶ 29. He promised that her salary would increase to over $70,000.00 per year with the change of title. *Id.* ¶ 25. He warned her, however, that if she ever went to Human Resources with her complaints about her title and salary, it would jeopardize his efforts to "fix" her position classification. *Id.* Ms. Harrington repeatedly asked Dean BenAicha to put these promises in writing, but she failed to obtain a written promise. *Id.* She alleges that Dean BenAicha held the promised promotion out of reach for years as an incentive not to report his sexual harassment to the University. *Id.*

After Ms. Harrington filed a Title IX complaint, Dean BenAicha announced that he was taking medical leave. *Id.* ¶ 26. Before he left, Dean BenAicha submitted an elevation plan to Human Resources.[2] This plan did not include any documentation for Ms. Harrington's promised re-classification. *Id.* ¶ 29.

On or around January 3, 2019, Acting Dean of Libraries Constance Vrattos told Ms. Harrington that, based on her job

---

[2] The First Amended Complaint does not specifically allege whether Dean BenAicha submitted this elevation plan to Human Resources before or after Ms. Harrington filed a complaint with Lesley University's Title IX coordinator on or around November 20, 2018.

description, her salary was around $20,000.00 per year less than
what it should have been.  *Id*.  Accordingly, Dean Vrattos told
Ms. Harrington that she would submit a request to the University
for a salary change of two levels on the basis that the
requested salary grade level and title recognized what Ms.
Harrington's position had been the entire time she worked at the
University.  *Id.*  Dean Vrattos apologized to Ms. Harrington that
it had taken so long to fix her salary and title.  *Id.*

On or around June 24, 2019, Lesley University rejected the
request as presented and approved only a one-grade salary
increase.  *Id.* ¶ 30.  Dean Vrattos told Ms. Harrington that,
because her salary was on the lowest rung of the relevant salary
range, the one-grade salary increase amounted to a 6.7% raise,
or $4,000.00 per year.  *Id.*  Two male colleagues in the library
received raises of 13.7% and of 11% at that time.  *Id.* ¶ 31.
Even after her June 2019 raise, Ms. Harrington's salary was
substantially equivalent to her 2016 starting salary as
Temporary Art Librarian.

Ms. Harrington is currently employed by the University in
the position of Art Librarian and Head of Moriarty Library.  *Id.*
¶ 7.  She has never received the relocation benefits or
professional development funds that Dean BenAicha promised would
be part of her compensation or benefits.  *Id.* ¶¶ 12, 32.

**B.   *Procedural History***

1.   Title VII Administrative Exhaustion

Ms. Harrington filed a Complaint with the Massachusetts
Commission Against Discrimination ("MCAD") on June 30, 2020
against the Defendants.  *Id.* ¶ 4.  She alleged violations of the
Massachusetts Fair Employment Practices Act, Massachusetts
General Laws ch. 151B ("Chapter 151B"), and of Title VII.

On October 13, 2020, Ms. Harrington filed a Notice of
Withdrawal of her Complaint with the MCAD.  *Id.* ¶ 5.  *See* 804
Mass. Code Regs. § 1.04(12)(c).  On the following day, she
received a Notice of Right to Sue from the U.S. Equal Employment
Opportunity Commission ("EEOC").  *See* FAC ¶ 6.

2.   Commencing a Lawsuit and Removal to Federal Court

On June 30, 2020, the same day Ms. Harrington filed her
MCAD Complaint, she sued Lesley University and Dean BenAicha in
Massachusetts state superior court.  *See* Complaint, *Micki
Harrington* v. *Lesley Univ. & Hedi BenAicha*, No. 2081CV01502,
2020 WL 3915002 (Mass. Super. June 30, 2020).  She alleged one
count of civil battery (Count V) against Dean BenAicha and six
counts against Lesley University.  Under Title IX, she alleged
sexual harassment (Count I), wage discrimination (Count II), and
retaliation (Count III).  She also alleged promissory estoppel
(Count IV), negligent retention and supervision (Count VI), and
negligent infliction of emotion distress (Count VII).  *Id.*

The Defendants removed the case to federal court.  On September 25, 2020, the University moved to dismiss all claims against it (Counts I-IV, VI, VII).

On October 14, 2020, the same day that Ms. Harrington received her Notice of Right to Sue from the EEOC, she filed a First Amended Complaint with newly differentiated counts under Chapter 151B and Title VII.  *See* FAC ¶¶ 34-70 (Counts I-VII).  With respect to Lesley University, she now alleged ten claims.  Under Chapter 151B, she alleged sexual harassment (Count I), wage discrimination (Count II), and retaliation (Count III).  Under Title VII, she alleged sexual harassment (Count IV), wage discrimination (Count V), and retaliation (Count VI).  Under Title IX, she alleged sexual harassment (Count VIII), wage discrimination (Count IX), and retaliation (Count X).  In addition, she alleged promissory estoppel (Count XI).  With respect to the individual Defendant, Dean BenAicha, she alleged sexual harassment under Chapter 151B (Count VII) and civil battery (Count XII).

Two weeks later, the Defendants filed a renewed joint motion to dismiss eleven[3] of the twelve counts: all claims against Lesley University (Counts I-VI, VIII-XI) and the sexual

---

[3] No motion to dismiss was made as to the civil battery claim (Count XII) against Dean BenAicha.

harassment claim under Chapter 151B against Dean BenAicha (Count VII).  That motion is the subject of this Memorandum.

## II. MOTION TO DISMISS

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft* v. *Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007)).  The plausibility standard "does not demand 'a high degree of factual specificity,'" *García-Catalán* v. *United States*, 734 F.3d 100, 103 (1st Cir. 2013) (quoting *Grajales* v. *P.R. Ports Auth.*, 682 F.3d 40, 47 (1st Cir. 2012)), nor must the plaintiff "demonstrate that she is likely to prevail" at this stage, only that her claims are facially plausible, *id.* at 102.  Plausible means "enough to raise a right to relief above the speculative level." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 555 (2007). And "the choice between or among plausible interpretations of the evidence will be a task for the factfinder." *Evergreen Partnering Grp., Inc.* v. *Pactiv Corp.*, 720 F.3d 33, 46 (1st Cir. 2013) (quoting *Anderson News, L.L.C.* v. *Am. Media, Inc.*, 680 F.3d 162, 190 (2d Cir. 2012)).

The Defendants advance three principal arguments for dismissal of Ms. Harrington's claims: (1) that the statute of limitations has passed with respect to Title VII and Chapter

151B; (2) that she lacks a private cause of action as an employee under Title IX; and (3) that she fails to allege sufficient facts to establish wage discrimination, retaliation, and promissory estoppel.  I will comprehensively address the first two arguments in Sections II.A and II.B before considering the remaining argument in Section II.C.

## A.    *Title VII and Chapter 151B*

Discrimination claims under Title VII and Chapter 151B must be pursued administratively prior to the filing of a lawsuit. Under both statutes, a charge must be filed with the MCAD within 300 days of the latest alleged discriminatory event.  *See* 42 U.S.C. § 2000e-5(e)(1); Mass. Gen. Laws ch. 151B § 5.  Failure to file a timely MCAD charge requires the dismissal of any subsequent lawsuit.  *See Davis* v. *Lucent Techs., Inc.*, 251 F.3d 227, 236 (1st Cir. 2001).

Ms. Harrington filed her MCAD charge on June 30, 2020.  She alleges no discriminatory events within the 300 days prior to that filing – September 4, 2019 to June 30, 2020.  The latest discriminatory event alleged occurred on June 24, 2019, when Ms. Harrington received a raise of only one salary grade level.

Ms. Harrington contends that the statute of limitations has not yet run on her claims for three reasons: (1) her Title VII wage discrimination claim in Count V falls under the Lilly Ledbetter Fair Pay Act of 2009, Pub. L. No. 111-2, 125 Stat. 5

11

(codified at 42 U.S.C. § 2000e-5(e)(3)(A)); (2) her claims are tolled by the general pandemic relief orders entered by the Massachusetts Supreme Judicial Court (the "SJC"); and, in the alternative, (3) her claims are preserved by the continuing violation doctrine.

### 1.   Continued Receipt of Paychecks and the Lilly Ledbetter Fair Pay Act

Ms. Harrington contends that her claim of wage discrimination (Count V) under Title VII is preserved by the Lilly Ledbetter Fair Pay Act, which provides that wage discrimination occurs "each time wages, benefits, or other compensation is paid, resulting in whole or in part from" a discriminatory compensation decision or practice.  42 U.S.C. § 2000e-5(e)(3)(A).

Congress passed the Lilly Ledbetter Fair Pay Act in response to the Supreme Court's holding in *Ledbetter* v. *Goodyear Tire & Rubber Co., Inc.*, 550 U.S. 618 (2007).  The significance of that statute in this case requires an extended discussion.

In *Ledbetter*, Ms. Ledbetter alleged that, throughout her employment at Goodyear from 1979 to 1998, her supervisors evaluated her poorly on the basis of her sex, which resulted in lower pay than if her evaluations had been non-discriminatory. *Id.* at 621.  At trial, she proved that the string of discriminatory pay decisions resulted in a significantly lower

salary than that of her male peers.  *Id.* at 622.  The jury found
in her favor and awarded her backpay and damages.  *Id.*

On review, the Supreme Court reversed the verdict and held
that Ms. Ledbetter's theory of a continuing harm renewed with
each paycheck was not viable because a "new violation does not
occur, and a new charging period does not commence, upon the
occurrence of subsequent nondiscriminatory acts that entail
adverse effects resulting from the past discrimination."  *Id.* at
628.

Justice Ginsburg dissented and contended that compensation
discrimination fundamentally differed from discrete adverse
employment actions:

> Pay disparities often occur, as they did in Ledbetter's
> case, in small increments; cause to suspect that
> discrimination is at work develops only over time.
> Comparative pay information, moreover, is often hidden
> from the employee's view. . . . Pay disparities are thus
> significantly different from adverse actions "such as
> termination, failure to promote, . . . or refusal to
> hire," all involving fully communicated discrete acts,
> "easy to identify" as discriminatory. It is only when
> the disparity becomes apparent and sizable, *e.g.*,
> through future raises calculated as a percentage of
> current salaries, that an employee in Ledbetter's
> situation is likely to comprehend her plight and,
> therefore, to complain.

*Id.* at 645 (Ginsburg, J., dissenting) (quoting *Nat'l R.R.*
*Passenger Corp.* v. *Morgan*, 536 U.S. 101, 114 (2002)).  Justice
Ginsburg called upon Congress "to correct this Court's

parsimonious reading of Title VII." *Id.* at 661.  Congress

responded by enacting the Lilly Ledbetter Fair Pay Act.

The Lilly Ledbetter Fair Pay Act amended Title VII by

adding the following language:

> [A]n unlawful employment practice occurs, with respect
> to discrimination in compensation . . ., when a
> discriminatory compensation decision or other practice
> is adopted, when an individual becomes subject to a
> discriminatory compensation decision or other practice,
> or when an individual is affected by application of a
> discriminatory compensation decision or other practice,
> *including each time wages, benefits, or other
> compensation is paid, resulting in whole or in part from
> such a decision or other practice.*

42 U.S.C. § 2000e-5(e)(3)(A) (emphasis added).[4]  In its statutory

findings, Congress adopted the logic of Justice Ginsberg's

dissent, observing that *Ledbetter* "unduly restrict[ed] the time

period in which victims of discrimination can challenge and

recover for discriminatory compensation decisions." Pub. L. 111-

2, 123 Stat. 5 § 2(1).

Under the Lilly Ledbetter Fair Pay Act, "'a new cause of

---

[4] The Lilly Ledbetter Fair Pay Act further provides that a
plaintiff may assert facts arising from events outside "the
charge filing period" when advancing a claim of wage
discrimination in compensation under Title VII:

> [L]iability may accrue and an aggrieved person may
> obtain . . . recovery of back pay for up to two years
> preceding the filing of the charge[] where the
> unlawful employment practices that have occurred
> during the charge filing period are similar or related
> to unlawful employment practices with regard to
> discrimination in compensation that occurred outside
> the time for filing a charge.

42 U.S.C. § 2000e-5(e)(3)(B).

action for pay discrimination ar[ises] every time a plaintiff
receive[s] a paycheck resulting from an earlier discriminatory
compensation practice' – even one that 'occurr[ed] outside the
statute of limitations period.'" *Kellogg* v. *Ball State Univ.*,
984 F.3d 525, 529 (7th Cir. 2021) (alterations in original)
(quoting *Groesch* v. *City of Springfield*, 635 F.3d 1020, 1027
(7th Cir. 2011)).  The language of the Lilly Ledbetter Fair Pay
Act may be read as broad enough to encompass any employment
discrimination claim.  Although the First Circuit has yet to
speak on the issue, the Second, Third, Tenth, and D.C. Circuits,
have, however, limited the reach of the Act to the specific
claim in *Ledbetter* – that an employer is "paying different wages
or providing different benefits to similarly situated
employees." *Daniels* v. *United Parcel Serv., Inc.*, 701 F.3d 620,
630–31 (10th Cir. 2012) (quoting *Schuler* v.
*PricewaterhouseCoopers, LLP*, 595 F.3d 370, 374 (D.C. Cir.
2010)); *see also Davis* v. *Bombardier Transp. Holdings (USA)
Inc.*, 794 F.3d 266, 271 (2d Cir. 2015); *Schuler* v.
*PricewaterhouseCoopers, LLP*, 595 F.3d 370, 375 (D.C. Cir. 2010);
*Noel* v. *The Boeing Co.*, 622 F.3d 266, 274 (3d Cir. 2010).

The Fifth and Seventh Circuits have each addressed claims
similar to that before me: a wage discrimination claim with
origins either in an employee's depressed starting salary or in
accumulated discriminatory wage raises.  This year, the Seventh

Circuit concluded that a pay disparity resulting from a depressed starting salary is "precisely the kind of decision covered by the Ledbetter Act." *Kellogg*, 984 F.3d at 529 (quoting *Groesch*, 635 F.3d at 1025).  The Seventh Circuit held that all of the plaintiff's pay encompassed in continued paychecks resulted from that initial decision "because the [defendant] admittedly based [the plaintiff's] later pay on raises from her starting salary." *Id.*  Thus, each of the plaintiff's subsequent paychecks gave rise to a new cause of action.  *Id.*

Similarly, in an unpublished decision, the Fifth Circuit held that the Lilly Ledbetter Fair Pay Act tolled the Title VII wage-discrimination claims of a plaintiff who alleged that she and a male colleague in the same role "were hired during the same year and for the same compensation, [then the colleague] received increasingly higher compensation than [the plaintiff] during each successive year of their employment." *Niwayama* v. *Tex. Tech Univ.*, 590 F. App'x 351, 354 (5th Cir. 2014) (per curiam).  The court ruled that "each paycheck at an allegedly discriminatory rate [was] a separate, discrete act of discrimination, effectively resetting the statute of limitations for filing an EEOC charge." *Id.* at 356.

Under such Court of Appeals caselaw outside the First Circuit, Ms. Harrington must allege, in order to fall within the

16

coverage of the Lilly Ledbetter Fair Pay Act, that her depressed
salary resulted either from a low initial salary, *see Kellogg*,
984 F.3d at 529, or from a series of accumulating inequitable
promotions, *see Niwayama*, 590 F. App'x at 354 n.1.   The First
Amended Complaint alleges facts under both theories.   The
conversation in January 2019 with Dean Vrattos reflects that Ms.
Harrington's salary was around $20,000 per year, or two grade
levels, less than appropriate for her job description throughout
her employment at Lesley University.   The allegations also
reflect that the University approved a salary grade increase of
one level in June 2019.   The one level increase resulted in only
a 6.7% raise because Ms. Harrington's salary was at the lowest
rung of the relevant salary range.   By contrast, two of her male
colleagues received raises of 11% and 13.7%, respectively.
Whether the alleged pay disparity resulted from a depressed
starting salary or from unequal promotions, Ms. Harrington
alleges increasing pay discrimination resulting from "future
raises calculated as a percentage of [her] current salar[y]."
*Ledbetter*, 550 U.S. at 645 (Ginsburg, J., dissenting).

That said, Ms. Harrington fails to allege with sufficient
particularity two critical elements.   First, she fails to
identify the two male colleagues as "similarly situated . . . in
terms of performance, qualifications and conduct, 'without such
differentiating or mitigating circumstances that would

distinguish' their situations." *Smith* v. *Stratus Comput., Inc.*, 40 F.3d 11, 17 (1st Cir. 1994) (quoting *Mitchell* v. *Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).  The First Amended Complaint states only that, "[a]t the same time that the Plaintiff received a 6.7% raise, two male colleagues that worked in the library received raises of 13.7% and 11%, respectively." FAC ¶ 31.  This assertion is insufficient as a matter of law to allege adequately that the two male colleagues were "similarly situated" comparisons.

Second, she fails to clarify whether she continued to receive a depressed salary through, at least, September 4, 2019, thereby placing her within the 300-day statute of limitations. Her First Amended Complaint states only that, "[t]o date, Ms. Harrington has not received the full compensation and benefits to which she is entitled from Lesley University." *Id.* ¶ 32.

At this point, Ms. Harrington has failed to allege adequately that the Lilly Ledbetter Fair Pay Act tolls the statute of limitations on her wage discrimination claim under Title VII.  Given the lack of governing First Circuit case law, I will not, however, permit the inadequately crafted First Amended Complaint to end the pleadings in this matter without affording Ms. Harrington one final opportunity to present sufficient facts supporting viable allegations that Ms. Harrington continued to receive depressed paychecks from Lesley

University after September 4, 2019, and that these depressed paychecks resulted in lower pay than her similarly situated male counterparts.

I will allow the motion to dismiss as to Title VII without prejudice to Ms. Harrington's opportunity to file a Second Amended Complaint addressing her claim of wage discrimination under Title VII (Count V).[5]

### 2.   Supreme Judicial Court Tolling Policy

Ms. Harrington contends that both her Chapter 151B and Title VII claims survive because the SJC, the highest Massachusetts state court, tolled all statutes of limitations effective as of March 17, 2020 – meaning that her June 30, 2020 MCAD Complaint would satisfy the limitations period of both statutes. *See* In Re *Covid-19 (Coronavirus) Pandemic*, OE-144 *Second Updated Order Regarding Court Operations Under the Exigent Circumstances Created by the COVID-19 (Coronavirus) Pandemic* ("SJC Order") (repealed July 1, 2020),

---

[5] I conclude that the Lilly Ledbetter Fair Pay Act does not apply to Ms. Harrington's sexual harassment (Count IV) and retaliation (Count VI) claims under Title VII because they fall outside the core meaning of compensation discrimination. *See Schuler* v. *PricewaterhouseCoopers, LLP*, 595 F.3d 370, 375 (D.C. Cir. 2010) (holding that the Lilly Ledbetter Fair Pay Act "is directed at the specific type of discrimination involved in [*Ledbetter*] and not to other unspecified types of discrimination in employment"); *Rzepiennik* v. *Archstone-Smith, Inc.*, 331 F. App'x 584, 589 n.3 (10th Cir. 2009) ("There is no indication in the [Lilly Ledbetter Fair Pay Act] that Congress intended this change to affect retaliation claims . . . .").

https://www.mass.gov/doc/repealed-sjc-second-updated-order-
regarding-court-operations-under-the-exigent-
circumstances/download.  "[P]ursuant to its superintendence and
rule-making authority," the SJC declared that "[a]ll civil
statutes of limitations are tolled from March 17, 2020, through
June 30, 2020, when the tolling period shall end . . . ."  *Id.* ¶
12.

Turning first to application of the SJC Order to federal
law, I must recognize as a general rule that a state supreme
court has no authority over federal courts in their application
of federal law.  *See, e.g.*, *United States* v. *Bedford*, 519 F.2d
650, 653 n.3 (3d Cir. 1975) ("It is a recognized principle that
a federal court is not bound by a state court's interpretation
of federal laws . . . .").  *See generally* U.S. Const. art. VI
cl. 2 ("[T]he Laws of the United States . . . shall be the
supreme Law of the Land; and the Judges in every State shall be
bound thereby . . . .").

Ms. Harrington contends that the SJC Order can toll the
Title VII statute of limitations because the MCAD has initial
jurisdiction over Title VII claims.  While the MCAD has initial
jurisdiction over Title VII charges filed within the
Commonwealth, the EEOC's "deferral policy" does not (and cannot)
thereby supplant the statute of limitations fixed by Congress
under federal law.  The processing of discrimination claims by

state entities is a matter of federal law, not a displacement of
federal law.  *See* 29 C.F.R. § 1601.13(a)(3)(ii) (granting
"States and their political subdivisions the exclusive right to
process allegations of discrimination filed by a person . . . .
After the expiration of the exclusive processing period, the
[Equal Employment Opportunity] Commission may commence
processing the allegation of discrimination").

Whether the SJC has authority to toll the statute of
limitations for state law under Chapter 151B is not so clear.
Massachusetts General Laws Chapter 211 provides that the SJC's
"general superintendence shall not include the authority to
supersede any general or special law unless the supreme judicial
court . . . finds such law to be unconstitutional in any case or
controversy."  Mass. Gen. Laws ch. 211, § 3.  And while the SJC
has rejected these provisos "as limitations on this court's
inherent power to superintend the court system," *Sullivan* v.
*Chief Justice for Admin. & Mgmt. of Trial Ct.*, 858 N.E.2d 699,
721 (Mass. 2006), the Court still has no general superintendence
authority over an administrative agency designated by the
Commonwealth as the primary enforcement agency for certain state
laws, such as the MCAD for Chapter 151B claims.[6]  Indeed, by its
terms, the SJC's order applies only to "courts."  SJC Order ¶ 2.

---

[6] The SJC has "general superintendence" authority to "issue all
writs and processes to [courts of inferior jurisdiction] and to

The SJC has held that the "primary responsibility to determine the scope of [Chapter 151B] has been entrusted to the MCAD, not to the courts." *Rock* v. *Mass. Comm'n Against Discrimination*, 424 N.E.2d 244, 249 (Mass. 1981), *abrogated on other grounds by Clifton* v. *Mass. Bay Transp. Auth.*, 839 N.E.2d 314, 321 (Mass. 2005). Accordingly, the SJC "ha[s] consistently granted deference to MCAD decisions and policies" where the SJC finds that the MCAD's "interpretation and application . . . is reasonable and conforms to the agency's statutory directive." *Cuddyer* v. *Stop & Shop Supermarket Co.*, 750 N.E.2d 928, 938 (Mass. 2001). *Cf. Desando* v. *Lucent Techs.*, 193 F. Supp. 2d 358, 362 (D. Mass. 2002) (granting deference to the MCAD's grievance process tolling rule). During the COVID-19 pandemic, the MCAD in fact issued its own directive tolling Chapter 151B deadlines on a case-by-case basis at the discretion of an individual commissioner. *See MCAD COVID-19 Information Resource Center: How to Submit a Request for Tolling and Extensions*, MASS.GOV (2021), https://www.mass.gov/guides/mcad-covid-19-information-resource-center.

The MCAD's pandemic tolling rule is the relevant policy to apply in this case. State law required Ms. Harrington to file a

---

corporations and individuals which may be necessary to the furtherance of justice and to the regular execution of the laws." Mass. Gen. Laws ch. 211 § 3. This power by its terms does not extend to state administrative agencies.

complaint within 300 days with the MCAD, not with the courts. *See* Mass. Gen. Laws ch. 151B, § 5.  Pursuant to its rule promulgating authority, *id.* § 3(5), the MCAD decided to toll the statute of limitations on the complaints before it on a case-by-case basis.  But Ms. Harrington does not allege that she sought this relief from the MCAD.  Thus, I find that the statute of limitations on Ms. Harrington's Chapter 151B claims has not been tolled.

### 3.   Continuing Violation Doctrine

Alternatively, Ms. Harrington contends that her Title VII and Chapter 151B claims are preserved by the continuing violation doctrine, which provides, with respect to Chapter 151B, that "[w]hen facts are alleged which indicate unlawful conduct is of a continuing nature and part of an ongoing pattern of discrimination, the complaint may include actions outside of the statutory filing period so long as the last discriminatory act in the pattern occurred within the statutory filing period." 804 Mass. Code Regs. § 1.04(4)(b).  Under Title VII, the continuing violation is an "equitable exception that allows an employee to seek damages for otherwise time-barred allegations if they are deemed part of an ongoing series of discriminatory acts and there is 'some violation within the statute of limitations period that anchors the earlier claims.'"  *O'Rourke* v. *City of Providence*, 235 F.3d 713, 730 (1st Cir. 2001)

(quoting *Provencher* v. *CVS Pharmacy, Div. of Melville Corp.*, 145 F.3d 5, 14 (1st Cir. 1998)).  Ms. Harrington bears the burden of establishing that the continuing violation doctrine applies. *See Shervin* v. *Partners Healthcare Sys., Inc.*, 804 F.3d 23, 34 (1st Cir. 2014) (addressing both state-law and federal-law claims of unlawful discrimination and retaliation).

To establish the availability of the continuing violation doctrine, a plaintiff must allege three prerequisites.  First, the claim must arise from "a series of related events that have to be viewed in their totality in order to assess adequately their discriminatory nature and impact." *Cuddyer*, 750 N.E.2d at 936.  Second, at least one incident of discrimination must have occurred within the limitations period. *Shervin*, 804 F.3d at 35.  And third, a reasonable person in Ms. Harrington's circumstances would have refrained from filing a complaint within the limitations period. *Cuddyer*, 750 N.E.2d at 942.[7]

---

[7] On the third element, the federal-law and state-law standards under the continuing violation doctrine differ substantively. The federal-law inquiry is whether a plaintiff was aware that she was being discriminated against and "would deny a plaintiff damages for unlawful conduct falling outside of the statute of limitations period if, at the time the conduct occurred, she had notice that she had an actionable claim." *Cuddyer* v. *Stop & Shop Supermarket Co.*, 750 N.E.2d 928, 942 (Mass. 2001).  By contrast, the state-law test "focuses on the plaintiff's knowledge of the hopelessness of her work environment, and allows her to litigate alleged, otherwise time-barred, [unlawful] acts . . . unless her delay in initiating the lawsuit, considered under an objective standard, was unreasonable." *Id.*  The separate standards under state and

Ms. Harrington stumbles at the second prerequisite.  She contends that her anchoring act is Lesley University's denial of a two-level salary increase on June 24, 2019.  But this event occurred more than 300 days prior to her filing of charges with the MCAD on June 30, 2020.  The continuing violation doctrine was not designed as an end run to evade the statute of limitations but as a mechanism to preserve the legitimate claims of plaintiffs who "might not realize that a violation has occurred, or might not have sufficient evidence to support a Title VII claim until more than the general time limit to file their claims has elapsed."  *Ayala* v. *Shinseki*, 780 F.3d 52, 58 (1st Cir. 2015); *see also Cuddyer*, 750 N.E.2d at 941 (holding, with respect to a hostile work environment claim under Chapter 151B, that the continuing violation doctrine "recognize[s] . . . an employee who suffers from recurring acts of [discrimination] . . . may be unable to appreciate the true character and enormity of the discriminatory environment until after it has continued for an appreciable length of time.").

I find that Ms. Harrington has failed to establish that the continuing violation doctrine applies to her claims under Title

federal law are not relevant in the case now before me because Ms. Harrington's claims under both Title VII and Chapter 151B fail at the second step of the continuing violation doctrine for lack of allegations that at least one incident of discrimination occurred within the limitations period.

VII and Chapter 151B.[8]

---

[8] Ms. Harrington argues two additional reasons for a conclusion that the statute of limitations on her claims under Title VII and Chapter 151B should be tolled.  First, she invokes the equitable tolling doctrine exception, which is available to a plaintiff where she is "excusably ignorant" of the statutory filing requirements or where she is "affirmatively misled" by the defendant (or the MCAD).  *Davis* v. *Lucent Techs., Inc.*, 251 F.3d 227, 234 (1st Cir. 2001) (emphasis omitted) (quoting *Andrews* v. *Arkwright Mut. Ins. Co.*, 673 N.E.2d 40, 41 (Mass. 1996)) (applying to a wrongful termination claim under Chapter 151B); *see also Rys* v. *U.S. Postal Serv.*, 886 F.2d 443, 446 (1st Cir. 1989) (equitable tolling doctrine applies "[where] a claimant has received inadequate notice, or where a motion for appointment of counsel is pending and equity would justify tolling the statutory period until the motion is acted upon, or where the court has led the plaintiff to believe that she had done everything required of her, . . . [or] where affirmative misconduct on the part of a defendant lulled the plaintiff into inaction" (alterations in original) (quoting *Baldwin Cty. Welcome Ctr.* v. *Brown*, 466 U.S. 147, 151 (1984)).
   However, "equitable tolling is reserved for exceptional cases."  *Chico-Velez* v. *Roche Prods., Inc.*, 139 F.3d 56, 59 (1st Cir. 1998) (unlawful discrimination under Title VII); *see also Adamczyk* v. *Augat, Inc.*, 755 N.E.2d 824, 830 (Mass. App. Ct. 2001) (noting, with respect to claims of unlawful discrimination under Chapter 151B, that "[c]ourts apply the principle of equitable tolling sparingly in employment discrimination cases").  The doctrine does not apply where a plaintiff simply failed to exercise due diligence to discover the information necessary to bring her charge.  *See Hall* v. *FMR Corp.*, 559 F. Supp. 2d 120, 126 n.9 (D. Mass. 2008) (citing state law) (unlawful discrimination under Chapter 151B); *see also Mercado* v. *Ritz-Carlton San Juan Hotel, Spa & Casino*, 410 F.3d 41, 48 (1st Cir. 2005) (noting, with respect to unlawful discrimination claims under Title VII, that courts generally consider "diligence in pursuing one's rights" when determining whether to allow equitable tolling).
   To be sure, Ms. Harrington contends that she diligently pursued her rights because she filed a formal complaint with the Title IX coordinator at Lesley University in November 2018 and then waited to file suit with the MCAD while the Title IX findings were pending for two years.  However, that Ms. Harrington chose to delay filing her MCAD charge on that basis does not make her "excusably ignorant" of the statutory filing

* * * *

I find that the statute of limitations has run on Ms. Harrington's claims under Chapter 151B against Lesley University (Counts I, II, III) and against Dean BenAicha (Count VII), and on her claims as alleged under Title VII against Lesley University (Counts IV, V, VI).  However, with respect to Ms. Harrington's allegation of wage discrimination under Title VII against Lesley University (Count V), I will allow Ms. Harrington to file a Second Amended Complaint pleading the claim with greater particularity.

**B.    *Title IX***

The Defendants contend that Ms. Harrington's claims of employment discrimination under Title IX fail as a matter of law because the comprehensive administrative scheme under Title VII

---

requirements nor "affirmatively misled" by Lesley University or by the MCAD.  This is not the sort of exceptional case for which the equitable tolling doctrine is reserved.

Second, Ms. Harrington contends that the MCAD's grievance proceeding policy tolls her Chapter 151B claims.  The MCAD recognizes an exception to the 300-day limitations period when "a grievance on behalf of an individual is filed pursuant to a collective bargaining agreement."  804 Mass. Code Regs. 1.04(4)(a).  However, Ms. Harrington fails to allege that her employment is covered by a collective bargaining agreement and that she raised a formal grievance.  Thus, she cannot invoke the grievance exception.  *See Shervin*, 805 F.3d at 39 (holding the grievance exception did not apply because plaintiff did not invoke any grievance proceedings pursuant to a collective bargaining agreement).

I find that neither the equitable tolling doctrine nor the grievance proceeding policy tolls the statute of limitations on Ms. Harrington's claims under Title VII and Chapter 151B.

occupies the field.  This argument draws from language in Title IX, which provides one express enforcement mechanism: withdrawal of federal funding by federal agencies.  *See* 20 U.S.C. § 1682. But the Supreme Court has long held that an implied cause of action for private litigants exists under Title IX.  *See Cannon* v. *Univ. of Chi.*, 441 U.S. 677, 717 (1979).  The Defendants contend, however, that the private right of action created in *Cannon* is limited to students and thus that Ms. Harrington's claims as an employee fall outside its scope.

### 1.    The Split Among the Federal Circuits

Federal circuit courts are split over the question whether, and under what circumstances, Title IX provides employees of federally funded educational institutions a private cause of action for employment discrimination claims.  The Defendants urge me to follow the Fifth and Seventh Circuits, which have held that Title VII provides the "exclusive means of relief" for employees claiming employment discrimination – regardless of whether their employer is a federally funded educational institution.  *Lakoski* v. *James*, 66 F.3d 751, 752 (5th Cir. 1995); *see also Waid* v. *Merrill Area Pub. Schs.*, 91 F.3d 857, 862 (7th Cir. 1996) ("Title VII provided the only way by which [the plaintiff] could obtain make-whole relief."), *abrogated on other grounds by Fitzgerald* v. *Barnstable Sch. Comm.*, 555 U.S.

246 (2009).[9]  Those courts cite the detailed administrative
exhaustion requirements under Title VII as evidence of
congressional intent to exclude a damages remedy under Title IX
for employees.  *See Lakoski*, 66 F.3d at 753; *Waid*, 91 F.3d at
861–62.  They reason that allowing employees to invoke Title IX
protection under *Cannon* would "disrupt a carefully balanced
remedial scheme for redressing employment discrimination by
employers."  *Lakoski*, 66 F.3d at 754; *see Waid*, 91 F.3d at 862.[10]

    But the majority of federal circuit courts have rejected
the contention that Title VII automatically preempts employment
discrimination claims brought under Title IX.  *See Doe* v. *Mercy*

---

[9] The Supreme Court abrogated the Seventh Circuit's decision in
*Waid* v. *Merrill Area Public Schools*, 91 F.3d 857 (7th Cir.
1996), by holding that Title IX was not the exclusive remedy
addressing sex-based discrimination in schools, thus a student
could bring a claim under 42 U.S.C. § 1983 alongside her claim
under Title IX.  *See Fitzgerald* v. *Barnstable Sch. Comm.*, 555
U.S. 246, 259 (2009).

[10] I note the decisions in the Fifth and Seventh Circuits predate
the Supreme Court's holding in *Jackson* v. *Birmingham Bd. of
Education*, 544 U.S. 167, 173 (2005), that Title IX provides a
private cause of action to employees of educational institutions
for retaliation claims based on the Court's identification of
significant differences between the statutory schemes of Title
VII and Title IX.  Post-*Jackson*, the only federal circuit court
to address directly the question before me held that Title IX
provides a private right of action for employees alleging
employment discrimination.  *See Doe* v. *Mercy Catholic Med. Ctr.*,
850 F.3d 545, 560 (3d Cir. 2017).  In another post-*Jackson*
opinion by a federal circuit court, the Tenth Circuit allowed an
employee of a federally funded educational institution to bring
federal claims for sex discrimination under both Title VII and
Title IX without explicitly addressing the question before me.
*See Hiatt* v. *Colo. Seminary*, 858 F.3d 1307, 1312 & n.8 (10th
Cir. 2017).

*Catholic Med. Ctr.*, 850 F.3d 545, 563 (3d Cir. 2017) (holding that a medical resident at a private hospital could allege employment discrimination claims for retaliation, quid pro quo harassment, and hostile work environment under Title IX); *Hiatt* v. *Colo. Seminary*, 858 F.3d 1307, 1315 (10th Cir. 2017) (allowing an employee of a university to proceed with parallel Title VII and Title IX claims in the same suit because Title IX "includes a prohibition on employment discrimination in federally funded educational programs"); *Preston* v. *Com. of Va. ex rel. New River Cmty. Coll.*, 31 F.3d 203, 205-06 (4th Cir. 1994) (allowing a counselor at a community college to allege retaliatory employment discrimination under both Title VII and Title IX); *Ivan* v. *Kent State Univ.*, No. 94-4090, 1996 U.S. App. LEXIS 22269, at *6 (6th Cir. July 26, 1996) (per curiam) (allowing a graduate student to allege employment discrimination under both Title VII and Title IX); *Lipsett* v. *Univ. of P.R.*, 864 F.2d 881, 896-97 (1st Cir. 1988) (holding that a medical resident at a private hospital could allege employment discrimination claims for retaliation, harassment, and hostile work environment under Title IX).

These courts have held that Title IX does not carve out private suits brought by employees and faculty from Title IX's protection against employment discrimination.  None of these courts have questioned that employees come within the literal

language of Title IX's statutory text.  The First Circuit and the Third Circuit, which have provided the fullest discussion, both expressly relied on the Supreme Court's guidance to federal courts to interpret the scope of Title IX's coverage broadly.  *See, e.g.*, *Mercy Catholic Med. Ctr.*, 850 F.3d at 555 (citing *Jackson* v. *Birmingham Bd. of Educ.*, 544 U.S. 167, 171 (2005)); *Lipsett*, 864 F.2d at 896 (citing *North Haven Bd. of Educ.* v. *Bell*, 456 U.S. 512, 521 (1982)).[11]

Ms. Harrington contends that *Lipsett* v. *University of Puerto Rico* has already settled this question before me in the First Circuit.  The Defendants contend that the holding in *Lipsett* is limited to student-employees.

In *Lipsett*, the First Circuit allowed a medical resident to bring employment discrimination claims against her university-employer under Title IX.  864 F.2d at 895.  The precise question facing the court was what substantive standard to apply.  In holding that the Title VII standard should be extended to employment discrimination claims under Title IX, the court noted that the plaintiff was "both an employee *and* a student," and thus, the court "ha[d] no difficulty extending the Title VII

---

[11] I note the Department of Justice has long "take[n] the position that Title IX and Title VII are separate enforcement mechanisms" and that "[i]ndividuals can use both statutes to attack the same violations."  *Title IX Legal Manual* 77, U.S. Dep't of Justice (Jan. 11, 2001).

standard to discriminatory treatment by a supervisor in this mixed employment-training context."  *Id.* at 897 (emphasis in original).

*Lipsett* did not by its terms purport to limit its holding to student plaintiffs.  Rather, the court recited that "the Supreme Court's only guidance" in interpreting Title IX is "that it must be accorded 'a sweep as broad as its language.'"  *Lipsett*, 864 F.2d at 896 (quoting *N. Haven Bd. of Educ.* v. *Bell*, 456 U.S. 512, 521 (1982)).[12]  Nevertheless, because of *Lipsett*'s distinct factual setting of a "mixed employment-training context," I find that it does not definitively dictate the rise or fall of Ms. Harrington's Title IX claims before me on the motion to dismiss.  864 F.2d at 897.[13]  The question requires

_____

[12] Moreover, *Lipsett* v. *University of Puerto Rico*, 864 F.2d 881, 896-97 (1st Cir. 1988), relied on *Mabry* v. *State Board of Community Colleges and Occupational Education*, 813 F.2d 311 (10th Cir. 1987), in which the Tenth Circuit considered a Title IX claim of employment discrimination brought by an employee plaintiff.  *Id.* at 315.  The Tenth Circuit ultimately held that the employee's claim was barred – not because Title VII precluded it but because the district court had already adjudicated the plaintiff's Title VII claim of employment discrimination.  *Id.* at 316.  Thus, under issue preclusion principles, the plaintiff "would be bound by [the court's] earlier finding of no sex discrimination under Title VII [because] the same legal standard applies to sex discrimination under Titles VII and IX."  *Id.*  The bottom line is that the Tenth Circuit case, referenced favorably by the First Circuit in *Lipsett*, recognized that the plaintiff had parallel rights against employment discrimination under both Title VII and Title IX.
[13] I note that at least two district judges within this Circuit have considered the question before me and both have found that

more extended discussion.

> 2.   Implied Rights of Action

Whether a federal statute implies a private right of action turns on analysis of four factors:

> First, is the plaintiff "one of the class for whose especial benefit the statute was enacted" . . .? Second, is there any indication of legislative intent, explicit or implicit, either to create such a remedy or to deny one?   Third, is it consistent with the underlying purposes of the legislative scheme to imply such a remedy for the plaintiff?  And finally, is the cause of action one traditionally relegated to state law, in an area basically the concern of the States, so that it would be inappropriate to infer a cause of action based solely on federal law?

*Cort* v. *Ash*, 422 U.S. 66, 78 (1975) (internal citations omitted).  Congressional intent is the "focal point."  *Thompson* v. *Thompson*, 484 U.S. 174, 179 (1988), *see also id.* at 189 (Scalia, J., concurring) ("[C]ongressional intent[] [is] *the determinative factor*." (emphasis in original)); *Transamerica Mortg. Advisors, Inc.* v. *Lewis*, 444 U.S. 11, 23–24 (1979) ("The

---

a private right of action exists for employees claiming employment discrimination under Title IX.  *See Farzinpour* v. *Berklee Coll. of Music*, No. 20-11003-PBS, 2021 WL 256953, at *4 (D. Mass. Jan. 26, 2021) (recognizing that "the factual context of *Lipsett* makes its holding less than clear-cut, [but that] courts have cited *Lipsett* for the proposition that Title VII does not preempt employment-discrimination claims brought under Title IX"); *Bedard* v. *Roger Williams Univ.*, 989 F. Supp. 94, 97 (D.R.I. 1997) ("[T]his court agrees with those courts which predictively view the Supreme Court's 'next logical step' as being to recognize a private cause of action under Title IX for employment discrimination against a federally funded education program.").

central inquiry remains whether Congress intended to create, either expressly, or by implication, a private cause of action."). Congressional intent "may appear implicitly in the language or structure of the statute, or in the circumstances of its enactment," *id.* at 18, and does not require evidence that Congress "actually had in mind the creation of a private cause of action," *Thompson*, 484 U.S. at 179.

### 3.   Statutory Text of Title IX

The text serves as the starting point. *See Touche Ross & Co.* v. *Redington*, 442 U.S. 560, 568 (1979). Title IX provides that "[n]o person . . . shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). A plain reading of Title IX does not distinguish between students and employees. The term "person" encompasses claims of both students and employees of federally funded educational programs and activities.

The Supreme Court has held, "[t]here is no doubt that 'if we are to give [Title IX] the scope that its origins dictate, we must accord it a sweep as broad as its language,'" *N. Haven Bd. of Educ.* v. *Bell*, 456 U.S. 512, 521 (1982) (quoting *United States* v. *Price*, 383 U.S. 787, 801 (1966)). Indeed, the Court has already held that an employee qualifies as a "person" within

the meaning of Title IX both for the purposes of an
administrative proceeding resulting in the withdrawal of federal
funds, *see id.* at 520, and in the context of a private
retaliation claim, *see Jackson* v. *Birmingham Bd. of Educ.*, 544
U.S. 167, 171 (2005).  The Court noted that "Congress easily
could have substituted 'student' or 'beneficiary' for the word
'person' if it had wished to restrict the scope of" Title IX,
and yet Congress chose the word "person" instead.  *N. Haven Bd.
of Educ.*, 456 U.S. at 521.

I find that the text of Title IX evidences no clear
congressional intent to *exclude* employees of educational
institutions from its protection.  Rather, it appears plainly to
contemplate inclusion of employees within its protections.  I
now turn to the structure of statutory schemes established by
Title VII and Title IX.

### 4.   The Statutory Schemes of Title VII and Title IX

The Defendants contend that the structure of administrative
exhaustion requirements under Title VII evidences congressional
intent to preclude claims of employment discrimination under
Title IX.

### a.   Administrative Exhaustion Requirements Under Title VII

Title VII makes it unlawful for an employer to discriminate
against any individual "because of such individual's race,

35

color, religion, sex, or national origin."  42 U.S.C. § 2000e-
2(a)(1).  Title VII provides an express private cause of action
in federal court but requires plaintiffs first to exhaust their
administrative remedies and obtain a right to sue letter.  *See*
*Id.* §§ 2000e-5(b), 2000d-5(f).

The statute of limitations for filing with the MCAD – the
EEOC counterpart in the Commonwealth – is 300 days from the last
alleged violation.  *See* 42 U.S.C. § 2000e-5(e)(1); *see also* 29
C.F.R. § 1601.13(a)(4)(ii)(A).  The MCAD then has 60 days to
consider and investigate the charges.  42 U.S.C. § 2000e-5(c).
If the MCAD waives its jurisdiction over the charges, or if the
60-day period runs out, the employee can then file charges with
the EEOC.  *Id.*  The EEOC has exclusive jurisdiction for up to
180 days to determine whether probable cause exists.  *See id.* §
2000e-5(b).  If the EEOC finds no probable cause, the charge is
dismissed without granting the complainant the right to sue.
*See id*.  If probable cause is found, then the EEOC will use
informal methods of "conference, conciliation, and persuasion"
to remedy the employer's unlawful discrimination.  *Id.*  If the
plaintiff is unsatisfied with the informal methods after the
expiration of the MCAD's 60-day period of exclusive
jurisdiction, she can request a "right to sue" letter.  Upon
receipt, the plaintiff has 90 days to sue in federal court.  *Id.*
§ 2000e-5(f).  If a plaintiff does not exhaust these

administrative requirements, she is precluded from bringing suit under Title VII. *See id.* §§ 2000e-5(b), § 2000d-5(f).

         b.   *Direct Access to Courts Under Title IX*

A claim under Title IX allows a plaintiff direct access to the courthouse. *See Cannon*, 441 U.S. at 717. The Defendants contend that, as a consequence, allowing employment discrimination claims to proceed under Title IX disrupts the enforcement scheme structured under Title VII.[14] The Supreme Court has recognized that a comprehensive statutory scheme to vindicate a protected right lends the presumption of exclusivity absent clear evidence of legislative intent to the contrary. *See Great Am. Fed. Sav. & Loan Ass'n* v. *Novotny*, 442 U.S. 366, 378 (1979) (holding 42 U.S.C. § 1985(3) precluded by Title VII), *superseded in part on other grounds by the 1991 Amendments to the Civil Rights Act of 1964*, Pub. L. No. 102-166, 105 Stat. 1071. However, this argument only holds if Title IX and Title

---

[14] While it is true that allowing Ms. Harrington's claim of employment discrimination to proceed under Title IX would recognize a distinction between how the claims of employees are treated inside and outside of educational institutions, it is equally true that not allowing her claim to proceed would create a disparity between employees who claim sex-based employment discrimination and employees who claim race-based employment discrimination. Under 42 U.S.C. § 1981, an employee complaining of racial discrimination can sue directly and bypass the Title VII exhaustion requirements. *See Johnson* v. *Ry. Express Agency, Inc.*, 421 U.S. 454, 465-66 (1975) ("Congress clearly has retained [Section] 1981 as a remedy against private employment discrimination separate from and independent of the more elaborate and time-consuming procedures of Title VII.").

VII are conceived to be merely "two remedies for the same right, not two rights addressing the same problem." *Lakoski*, 66 F.3d at 756.  But Title IX is – in design, remedy, constitutional basis, and intended impact – a fundamentally different statute structurally from Title VII.

       *c.   Distinctions Between Title VII and Title IX*

As the Supreme Court has recognized, "Title VII . . . is a vastly different statute from Title IX," *Jackson*, 544 U.S. at 175, in part because "Congress enacted Title IX not only to prevent the use of federal dollars to support discriminatory practices, but also 'to provide individual citizens effective protection against those practices,'" *id*. at 180 (quoting *Cannon*, 441 U.S. at 704).

First, the remedies in each statute are distinct.  Punitive damages are available under Title VII but not under Title IX. *See* Title VII, 42 U.S.C. § 1981a(a)(1); *Mercer* v. *Duke Univ.*, 50 F. App'x 643, 644 (4th Cir. 2002) (holding that, because Title IX was patterned after Title VI, the unavailability of punitive damages under Title VI "compels the conclusion that punitive damages are not available for private actions brought to enforce Title IX").  Damages under Title VII are capped at $300,000 and Title IX contains no cap for compensatory damages.  *See* Title VII, 42 U.S.C. § 1981a(b); *Gebser* v. *Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 285 (1998) ("Because Congress did not

38

expressly create a private right of action under Title IX, the statutory text does not shed light on Congress' intent with respect to the scope of available remedies.").

Second, the limitations period permitted plaintiffs under each statute is distinct. Title IX does not expressly prescribe a statute of limitations period so courts generally import the statute of limitations under state law for a personal injury claim. *See, e.g.*, *Doe* v. *Town of Bourne*, No. CIV.A.02-11363-DPW, 2004 WL 1212075, at *11 (D. Mass. May 28, 2004) (applying a three-year statute of limitations based on Massachusetts state law). Thus, the limitations period under Title IX actions is often longer than the 300 days afforded under Title VII.

Third, "Congress enacted Title IX against a backdrop of three recently issued implied-cause-of-action decisions of [the Supreme] Court involving civil rights statutes with language similar to that in Title IX. In all three, a cause of action was found." *Cannon*, 441 U.S. at 698 n.22. By contrast, Title VII contains an express private right of action and, as discussed, a wholly different statutory scheme.

Fourth, the statutes are derived from wholly separate constitutional provisions. Title VII was "enacted pursuant to the commerce power to regulate purely private decisionmaking." *United Steelworkers of Am., AFL-CIO-CLC* v. *Weber*, 443 U.S. 193, 206 n.6 (1979). Title IX was passed under the Spending Clause,

39

U.S. Const., Art. I, § 8, cl. 1, which offers an alternative ground for remedy bolstered by the traditional private suit.  By "conditioning an offer of federal funding on a promise by the recipient not to discriminate," Title IX creates a contractual obligation to "'protect[]' individuals from discriminatory practices carried out by recipients of federal funds." *Gebser*, 524 U.S. at 286–87.  As a structural matter, "[t]hat contractual framework distinguishes Title IX from Title VII, which is framed in terms not of a condition but of an outright prohibition." *Id.* at 286.

Finally, Title IX and Title VII serve distinct goals. Title VII has a singular goal of addressing workplace disputes and its statutory language "spells out in . . . detail the conduct that constitutes discrimination in violation of that statute." *Jackson*, 544 U.S. at 175.  Its administrative exhaustion scheme evidences a preference for "conference, conciliation, and persuasion" *outside* the judicial process.  42 U.S.C. § 2000e-5(b).  By contrast, Title IX's statutory language presents a different structure: it "is a broadly written general prohibition on discrimination, followed by specific, narrow exceptions to that broad prohibition." *Jackson*, 544 U.S. at 175.  And because it lacks administrative exhaustion requirements, the statute allows for direct access to the courts.  The separate exhaustion requirements represent the

distinct goals of each federal statute.  Title VII aims to "make persons whole for injuries suffered through past discrimination," *Gebser*, 524 U.S. at 287 (quoting *Landgraf* v. *USI Film Prods.*, 511 U.S. 244, 254 (1994)), whereas "Title IX focuses more on 'protecting' individuals," *id.* (quoting *Cannon*, 441 U.S. at 704).

Through Title IX, Congress "sought to accomplish two related, but nevertheless somewhat different, objectives." *Cannon*, 441 U.S. at 704.  First, "Congress wanted to avoid the use of federal resources to support discriminatory practices." *Id.*  Second, it "wanted to provide individual citizens effective protection against those practices."  *Id.*  Consistent with these dual purposes, Title IX is enforced both through administrative action and through private individual actions.  Title IX operates in both a top-down and a bottom-up fashion to secure the core mission of a learning environment free from sex-based discrimination.

These significant differences between the statutes reflect that Title IX and Title VII afford two separate federal rights, each with a distinct scope and an independent end, not two separate remedies addressing the same harm.  Neither statute should be read to support judicial restriction of the legal tools available to litigants to advance those goals.

The Court addressed a similar question of preclusion in
*Johnson* v. *Railway Express Agency, Inc.*, 421 U.S. 454 (1975),
when it considered the overlap of actions under Title VII and
actions under the Civil Rights Act of 1991, which grants "[a]ll
persons within the jurisdiction of the United States . . . the
same right . . . to the full and equal benefit of all laws and
proceedings."  42 U.S.C. § 1981.  The Court held that "remedies
available under Title VII and under [Section] 1981, *although
related, and although directed to most of the same ends*, are
separate, distinct, and independent."  *Johnson*, 421 U.S. at 461
(emphasis added).  The Court thus rejected concerns respecting
circumvention of Title VII's exhaustive administrative
requirements:

> Conciliation and persuasion through the [EEOC's]
> administrative process [under Title VII], to be sure,
> often constitute a desirable approach to settlement of
> disputes based on sensitive and emotional charges of
> invidious employment discrimination.  We recognize, too,
> that the filing of a lawsuit [under § 1981] might tend
> to deter efforts at conciliation [under Title VII], that
> lack of success in the legal action could weaken the
> [EEOC's] efforts to induce voluntary compliance, and
> that a suit is privately oriented and narrow, rather
> than broad, in application, as successful conciliation
> tends to be.  But these are the natural effects of the
> choice Congress has made available to the claimant by
> its conferring upon him independent administrative and
> judicial remedies.  The choice is a valuable one.  Under
> some circumstances, the administrative route may be
> highly preferred over the litigatory; under others the
> reverse may be true.

*Id.* at 461.[15]

The Supreme Court's logic in *Johnson* applies as much to the overlap between Title VII and Title IX as it does to the overlap between Title VII and § 1981.[16]  Whereas Title VII offers

---

[15] By contrast, in *Great American Federal Savings & Loan Association* v. *Novotny*, the Supreme Court concluded that 42 U.S.C. § 1985(3) was precluded by the administrative scheme in Title VII.  442 U.S. 366, 378 (1979).  However, the Court's holding relied on the fact that § 1985(3) "provides no substantive rights itself; it merely provides a remedy for violation of the rights it designates." *Id.* at 372.  Thus, Title VII could not be the basis for a cause of action under 42 U.S.C. § 1985(3).  Such a dependent right could only be enforced through a cause of action under Title VII.
  The case now before me is more akin to *Johnson* v. *Railway Express Agency, Inc.*, 421 U.S. 454 (1975).  Ms. Harrington seeks to enforce her independent rights under Title IX, which "explicitly confers a benefit on persons discriminated against on the basis of sex" in federally funded educational institutions.  *Cannon* v. *Univ. of Chi.*, 441 U.S. 677, 694 (1979).  Title IX is not simply a remedial law and does not provide a cause of action to vindicate rights established in other federal statutes.
[16] The Defendants, of course, resist this comparison.  They point to the fact that, just months before Congress enacted Title IX without an express private right of action, it repealed an exemption for educational institutions in Title VII.  *See* Equal Employment Opportunity Act of 1972, Pub. L. No. 92-261, 86 Stat. 103, 103, 104 (1972) (codified as amended at 42 U.S.C. §§ 2000e-2000e-17).  Their logic is that, by addressing sex-based employment discrimination through amendment of Title VII, Congress had no reason, and thus did not intend, to provide overlapping coverage under Title IX.  *Cf. Lakoski*, 66 F.3d at 757 (making the same argument with reliance on the accompanying House Report, which stated that the Amendment would close the loophole in Title VII by "bring[ing] those in education under the equal employment provision").
  But this argument is premised on the notion that Title IX was modeled after Title VII, or in other words, that the *lack* of an explicit cause of action in Title IX should be considered in relation to the *grant* of an explicit cause of action in Title VII.  That premise is faulty.

administrative remedies for informal conciliation, Title IX prioritizes direct resolution through an adversarial process. Whereas Title IX does not limit plaintiffs to a statutory damages cap, Title VII offers plaintiffs the opportunity to obtain punitive damages for intentional violations.  Whether a plaintiff will obtain higher damages under one statute or the other depends on the specific facts underlying the claims. Finally, whereas Title VII brings within its framework discrimination against a broad range protected classes in the workplace, Title IX aims its protection on the impacts of only sex-based discrimination and only in the educational environment.

---

First, Title IX was modeled after Title VI of the Civil Rights Act of 1964, which also lacks an express private cause of action.  *See* 42 U.S.C. § 2000d; *Cannon*, 441 U.S. at 694 n.16 (noting the "identical" statutory language).  Thus, after the Court held that Title VI afforded an implied private right of action, *see Guardians Ass'n* v. *Civil Serv. Comm'n of N.Y.*, 463 U.S. 582, 597 (1983), the Court also held that Title IX offered an implied private right of action, *see Cannon*, 441 U.S. at 716-17.  Congress has, since *Cannon*, amended Title IX twice, but declined to restrict the cause of action in any way on both occasions.  *See* Rehabilitation Act Amendments of 1986, 99-506, 100 Stat. 1845; Civil Rights Restoration Act of 1987, Pub. L. No. 100-259, 102 Stat. 28.

Second, the Supreme Court has explicitly recognized that Title VII – which the Defendants contend categorically precludes Title IX – was never intended to be an exclusive remedy: "[T]he legislative history of Title VII manifests a congressional intent to allow an individual to pursue independently his rights under both Title VII and other applicable state and federal statutes."  *Alexander* v. *Gardner-Denver Co.*, 415 U.S. 36, 48 (1974).

     *d.   No Basis to Conclude Congress Intended to*
        *Distinguish Employees from Employee-Students*

It is apparent that members of Congress were deeply concerned by employment discrimination against school employees at the time of Title IX's enactment.  The statute "grew out of hearings on gender discrimination in education, held in 1970 by a special House Subcommittee on Education[,] . . . [and] [m]uch of the testimony focused on discrimination against women in employment."  *N. Haven Bd. of Educ.*, 456 U.S. at 523 n.13. Despite its sparse legislative history,[17] there is no lack of reference to Title IX's protection of employees.  *See, e.g.*, S. Rep. No. 64, 100th Cong., 1st Sess. 18 (1987) (noting that Title IX "would apply only to the students and employees of educational programs"); 118 Cong. Rec. 5812 (1972) (Sen. Bayh) (noting Title IX extended to "employment, . . . as a member of a faculty or whatever . . . we permit no exceptions").[18]

By the time Title IX was enacted in 1972, "a backlog of 53,000 [EEOC] charges existed," including an unexpectedly high number of sex-discrimination charges.  E. Patrick McDermott, et

---

[17] Because Title IX was conceived of as a floor amendment, it was enacted through a legislative process in which there is generally an "absence of secondary legislative materials."  , *Cohen* v. *Brown Univ.*, 991 F.2d 888, 893 (1st Cir. 1993).
[18] "Although the statements of one legislator made during debate may not be controlling, Senator Bayh's remarks, as those of the sponsor of the language ultimately enacted, are an authoritative guide to the statute's construction."  *N. Haven Bd. of Educ.* v. *Bell*, 456 U.S. 512, 526–27 (1982) (internal citations omitted).

al., *An Evaluation of the Equal Employment Opportunity Commission Mediation Program*, EEOC Order No. 9/0900/7632/2 (Sept. 20, 2000), https://www.eeoc.gov/evaluation-equal-employment-opportunity-commission-mediation-program.  Congress was legislating in the shadow of this growing buildup of such claims.  Allowing employees of federally funded educational institutions the option to bypass Title VII's lengthy administrative procedures (in exchange for distinct remedies) served Title IX's broad goal to eradicate sex-based discrimination from the educational setting via a direct route to court for all victims involved.

Moreover, sex-based employment discrimination in the education context jeopardizes one of the statute's primary goals: that "students . . . not be denied access to educational benefits and opportunities on the basis of gender." *Davis* v. *Monroe Cty. Bd. of Educ.*, 526 U.S. 629, 650 (1999).  Where a federally funded educational institution discriminates against its employees on the basis of sex, students are denied the opportunities and benefits of an education free from sex-based employment discrimination practices regarding mentors and role models.[19]

---

[19] While the gap in students' gender representation in higher education programs has closed since the enactment of Title IX, it bears noting that current accounts evidence a gap in relative gender hierarchies remains.  Despite the fact that women

Finally, schools play an important role inculcating the
values of citizenship.  The vast majority of students in the
United States are educated within federally funded schoolhouse
gates.  The school, then, "is the first opportunity most
citizens have to experience the power of government. . . . The
values they learn there, they take with them in life."  *New
Jersey* v. *T.L.O*, 469 U.S. 325, 385-86 (1985) (Stevens, J.,
concurring in part and dissenting in part).  Educational staff
are highly visible models on campus and sex-based discrimination
shapes the learning environment in which students absorb gender
expectations.  *Cf. Sweezy* v. *New Hampshire*, 354 U.S. 234, 250
(1957) ("No one should underestimate the vital role in a
democracy that is played by those who guide and train our
youth.").  By the way in which they treat those in the
educational community on the basis of sex, employers in

---

represent 53% of all PhD enrollments in the United States in
2018, "women are more likely to be found in lower-ranking
academic positions."  *Women in Higher Education: Has the Female
Advantage Put an End to Gender Inequalities?*, at 27, UNESCO
(Mar. 8, 2021).  Apparently, at all faculty levels, men out-earn
women.  *Id.* at 29 ("[O]n average, faculty salaries for women
were 81.4% of those for men.").

  Considering the question of sexual harassment alleged in this
case before me, it bears further note that a meta-analysis
across work environments studying the prevalence of sexual
harassment found that academia (58%) comes second only to the
military (69%).  *See* Remus Ilies, Nancy Hauserman, Susan
Schwochau, & John Stibal, *Reported Incidence Rates of Work-
Related Sexual Harassment in the United States: Using Meta-
Analysis to Explain Reported Rate Disparities*, 56 Personnel
Psych. 607, 622-24 (2003).

federally funded educational institutions necessarily cultivate in students an understanding of gender attitudes, for good or ill.

In describing the need for an implied private cause of action in *Cannon*, the Supreme Court recognized that "complaints involving sex discrimination in higher education academic *employment*" are among "precisely those areas where private suits can be most effective."  *Cannon*, 441 U.S. at 708 n.42 (quoting 40 Fed. Reg. 24148 (1975) (emphasis added)).  "[A] female employee who works in a federally funded education program is 'subjected to discrimination under' that program if she is paid a lower salary for like work, given less opportunity for promotion, or forced to work under more adverse conditions than are her male colleagues."  *N. Haven Bd. of Educ.*, 456 U.S. at 521.  This is no less true for female employees than it is for female student-employees protected under *Lipsett*.  864 F.2d at 896–97.

At the heart of Title IX was a Congressional intention to eradicate sex-based discrimination in the education environment. Achievement of this goal turns on the nature of the employer as an educational provider, not on the status of the plaintiff as a student.  *See N. Haven Bd. of Educ.*, 456 U.S. at 530–31.  Title IX's comprehensive goal of fostering equal gender opportunity in

federally funded education environments encompasses the impact
of employment discrimination in the academic setting.

    5.   The Supreme Court's Treatment of Title IX

    The Supreme Court has yet to address the relationship
between Title IX and Title VII specifically, but its unfolding
case law over the past 40 years has consistently supported a
broad reading of Title IX.  A series of four cases merit note.

    In *Cannon* v. *University of Chicago*, decided in 1979, the
Court held that Title IX provides "person[s]" at federally
funded educational institutions with a private cause of action
to remedy sex-based discrimination by suing the employer
directly.  441 U.S. at 709.

    Two years later, in *North Haven Board of Education* v. *Bell*,
the Court concluded that Title IX covered sex-based employment
discrimination complaints because Congress could have simply
chosen to exclude employees by restricting the scope of
"person[s]" covered under the statute, but had chosen not to do
so as a matter of policy.  456 U.S. at 525, 539-40.[20]

    In 1992, a unanimous Court held that the implied right of
action to enforce Title IX includes both injunctive relief and a
damages remedy to redress intentional violations of the statute.

---

[20] Because the *North Haven* plaintiffs had filed charges with the
administrative agency to terminate their institutions' funding,
the Court did not address whether employees had a private cause
of action to vindicate their established rights under Title IX.

*See Franklin* v. *Gwinnett Cty. Pub. Schs.*, 503 U.S. 60 (1992). As relevant here, the *Franklin* Court considered and rejected that the remedies available under Title IX were limited to backpay and prospective relief.  503 U.S. at 75–76. Consideration of this argument would make little sense if the Court did not envision employment-discrimination complaints as falling under Title IX's protection.  *Id.* at 76.

Finally, in *Jackson*, the Supreme Court expressly recognized that Title IX extends to employee-plaintiffs, at least in the context of a retaliation claim.  *See* 544 U.S. at 171.  Although *Jackson* did not discuss the relationship between Title IX and Title VII, it definitively opened the door to employees to bring suit under Title IX against their employers for discrimination that directly impacted their employment.

From these cases, four key principles emerge: (1) persons protected by Title IX have a private cause of action to vindicate their rights under the statute (*Cannon*, 1979); (2) a compensatory damages remedy is available (*Franklin*, 1992); (3) Congress intended to protect employees of federally funded educational institutions from sex-based discrimination (*North Haven Board of Education*, 1982); and (4) such employees have, at the minimum, a private cause of action to sue for retaliation (*Jackson*, 2005).

These cases must also be viewed in light of the Supreme Court's admonition against finding Title VII precludes victims of discrimination from pursuing their choice of remedies, *see Johnson*, 451 U.S. at 461, and the Court's "repeated[] . . . recogni[tion] that Congress has provided a variety of remedies, at times overlapping, to eradicate employment discrimination," *N. Haven Bd. of Educ.*, 456 U.S. at 535 n.26 (citing *Electrical Workers* v. *Robbins & Myers, Inc.*, 429 U.S. 229, 236-39 (1976) (holding that the availability of a remedy under Title VII did not preclude grievance procedure under a collective bargaining agreement)); *Alexander* v. *Gardner-Denver Co.*, 415 U.S. 36, 47-49 (1974) (availability of contractual rights under a collective bargaining agreement does not preclude Title VII remedy).

* * * *

The Defendants have raised arguments for why, as a matter of policy, they believe that Title VII should be read to supervene Title IX employment discrimination claims brought on the basis of sex by employees of educational institutions. It is not the judicial role to determine the wisdom of policy decisions. Where two federal laws are capable of coexistence, and absent a clearly expressed congressional intention to the contrary, it is the responsibility of the courts "to regard each as effective" and to recognize the intended scope of each. *Vimar Seguros y Reaseguros, S.A.* v. *M/V Sky Reefer*, 515 U.S.

51

528, 533 (1995) (quoting *Morton* v. *Mancari*, 417 U.S. 535, 551
(1974)).  The Supreme Court "has not hesitated to give effect to
two statutes that overlap, so long as each reaches some distinct
cases." *J.E.M. Ag Supply, Inc.* v. *Pioneer Hi-Bred Int'l., Inc.*,
534 U.S. 124, 144 (2001) (rejecting that "'dual protection'
cannot exist" in the context of overlapping patent laws with
separate statutory scopes and procedures).

More specifically, the Supreme Court has never explicitly
limited Title IX's coverage to students, but has generally
recognized the statute's expansive reach regarding sex
discrimination in the educational environment since its
enactment.  Indeed, the Court has clearly instructed that, "if
[federal courts] are to give [Title IX] the scope that its
origins dictate, [federal courts] must accord it a sweep as
broad as its language." *N. Haven Bd. of Education*, 456 U.S. at
521 (quoting *Price*, 383 U.S. at 801).

Construing Title IX in that fashion, I find that Title VII
and Title IX are separate enforcement mechanisms, either or both
of which an individual may use to challenge sex-based employment
discrimination in a federally funded educational program.
Accordingly, I will deny the motion to dismiss Ms. Harrington's
Title IX claims (Counts VII, IX, X) against Lesley University.

## C.  *Promissory Estoppel*

Ms. Harrington claims promissory estoppel premised on

alleged oral promises made by Dean BenAicha in early August of 2016 with respect to the benefits of her employment in order to induce her to accept the position.

Under Massachusetts law, a promisee's reliance on a promise may suffice as a substitute for consideration to bring about the formation of a binding and enforceable contract. *See R.I. Hosp. Trust Nat'l Bank* v. *Varadian*, 647 N.E.2d 1174, 1179 (Mass. 1995) ("[A]n action based on reliance is equivalent to a contract action, and the party bringing such an action must prove all the necessary elements of a contract other than consideration.").

To state a claim for promissory estoppel, a plaintiff must allege that: "(1) a promisor makes a promise which he should reasonably expect to induce action or forbearance of a definite and substantial character on the part of the promise, (2) the promise does induce such action or forbearance, and (3) injustice can be avoided only by enforcement of the promise." *Carroll* v. *Xerox Corp.*, 294 F.3d 231, 242 (1st Cir. 2002) (quoting *Loranger Const. Corp.* v. *E.F. Hauserman Co.*, 374 N.E.2d 306, 308 (Mass. 1978)).

As with any contract, a necessary dimension to considering a contract formed by reliance is the character of the "promise" sought to be enforced.  The terms of the promise must be "definite and certain" such that the promisor would reasonably foresee that the promise would induce reliance.  *Santoni* v.

*FDIC*, 677 F.2d 174, 179 (1st Cir. 1982).  Accordingly, the promise must also be one by which the promisor expects and intends to be legally bound.  *See R.I. Hosp. Trust Nat'l Bank*, 647 N.E.2d at 1179.  An expression of present intent, *id.*, or a statement that "merely gives rise to a hope or expectation on the part of the promisee" is insufficient, *Kiely* v. *Raytheon Co.*, 914 F. Supp. 708, 712 (D. Mass. 1996).

Defendants contend that reliance on promises made by Dean BenAicha about the terms of employment with the University was unreasonable as a matter of law because the promises were not reduced to writing, were not sufficiently specific to support reasonable reliance, and were not represented to be approved by anyone at the University.

Claims for promissory estoppel must allege reasonable reliance on "an unambiguous promise."  *Upton* v. *JWP Businessland*, 682 N.E.2d 1357, 1360 (Mass. 1997).  Most of the terms set out in the oral promises given by Dean BenAicha are uncertain in material respects and reflect that the promises were ambiguous.  For example, Dean BenAicha stated that Ms. Harrington's initial position at the University would be "temporary" and that she would be promoted to Head Librarian after an unspecified "probationary period."  FAC ¶ 11.  This general description of her potential career trajectory is too indefinite to form a contractual agreement.  *See Saxon Theatre*

54

*Corp. of Bos.* v. *Sage*, 200 N.E.2d 241, 244 (Mass. 1964) (holding that a promise bearing "general description[s]" where details are "left unsettled" is "too indefinite to be enforced as an agreement").

That Ms. Harrington relied on Dean BenAicha's vague promises does not change the matter: "[A] promise that was only 'implicit' [is] not one that [can] be made into a contract by [the employee's] reliance on it." *Kiely* v. *Raytheon Co.*, 914 F. Supp. 708, 712 (D. Mass. 1996). At most, the promise of a promotion to Head Librarian created an agreement to enter into a future employment contract. And "[a]n agreement to enter into a contract which leaves the terms of that contract for future negotiation is too indefinite to be enforced." *Lucey* v. *Hero Int'l Corp.*, 281 N.E.2d 266, 270 (Mass. 1972) (quoting *Caggiano* v. *Marchegiano*, 99 N.E.2d 861, 865 (Mass. 1951)).

In addition, Ms. Harrington's offer of employment[21] specifically describes her role as "an employee at-will,"

---

[21] The Defendants contend that I should consider Ms. Harrington's offer of initial employment as an extrinsic document. Courts may not ordinarily consider extrinsic documents as part of a motion to dismiss except in "narrow exceptions," such as where documents have been "sufficiently referred to in the complaint." *Watterson* v. *Page*, 987 F.2d 1, 3 (1st Cir. 1993). Although I do not find that the First Amended Complaint sufficiently refers to the University's written offer of employment to allow its introduction, I find that Ms. Harrington, in her opposition brief to the Defendants' motion to dismiss, invites its introduction by referring to it in her responding arguments. I conclude that it is proper to consider the initial documented

meaning that Lesley University would "have the right to terminate [her] employment for any reason or no reason." These terms directly contradict the oral promise of promotion to Head Librarian. Under Massachusetts law, "[w]here a written statement conflicts with an oral statement, Massachusetts law assumes that a reasonable person will investigate further." *McMahon* v. *Dig. Equip. Corp.*, 162 F.3d 28, 39 (1st Cir. 1998). Here, Ms. Harrington "has simply chosen to believe the more appealing of two conflicting statements." *Id.* For the same reason, Ms. Harrington's allegations with respect to Dean BenAicha's promises of a raise in salary tied to her promotion to Head Librarian fail.

But Dean BenAicha's promise of relocation benefits and professional development funds as part of her compensation at the University are another matter. I find this promise sufficiently discrete and specific to support reliance. Moreover, nothing in the written employment contract contradicts the promise of those benefits.

I find that the First Amended Complaint sufficiently alleges a claim of promissory estoppel with respect to the relocation benefits and professional development funds promised

---

offer of employment as extrinsic evidence for the purpose of this motion to dismiss.

to Ms. Harrington by Dean BenAicha.  I will deny in part the
motion to dismiss Count XI (promissory estoppel) on that basis.[22]

### III. CONCLUSION

For the foregoing reasons, I GRANT in part and DENY in part
the Defendants' Motion [Dkt. No. 16] to dismiss the First
Amended Complaint.  As to Ms. Harrington's claims under Chapter
151B and Title VII, I GRANT the Motion and dismiss Counts I-VI
against Lesley University and Count VII against Dean BenAicha.
With respect to the claims under Title IX, I DENY the Motion to
dismiss Counts VIII to X against Lesley University.  I also DENY
the Motion to dismiss the claim of common law promissory
estoppel in Count XI against Lesley University to the extent it

---

[22] The Defendants also contend that Ms. Harrington's retaliation
claims under Title VII (Count VI) and Title IX (Count X) fail as
a matter of law because she does not allege a retaliatory
motive.  I disagree.  I find that Ms. Harrington has set forth
sufficient allegations to survive a motion to dismiss.  Although
seven months passed between her filing of a Title IX complaint
in November 2018 and the University's rejection of a two-level
salary increase in June 2019, the inference of retaliation is
here reinforced by other corroborative evidence.  In a January
2019 meeting, Dean Vrattos apologized to Ms. Harrington that her
salary was $20,000.00 per year less than what it should have
been throughout her employment at the University, based on her
job description.  In a June 2019 meeting, the Dean acknowledged
to Ms. Harrington that her salary was on the lowest side of the
relevant salary range.  These statements must also be considered
in light of Lesley University's continuing failure to share
findings from its Title IX investigation.  The allegations may
be thin but at this early stage prior to discovery they are
sufficient to survive a motion to dismiss.

alleges claims for relocation expenses and professional development funds.

I will grant Ms. Harrington leave on or before August 31, 2021, to file a Second Amended Complaint to allege a wage discrimination claim under Title VII against Lesley University with greater particularity, failing which the allowance of the motion to dismiss that claim for the reasons stated in this Memorandum will stand.  If such a Second Amended Complaint compliant with Fed. R. Civ. P. 11 is timely filed, the dismissal of the wage discrimination claim under Title VII, asserted in Count V of the First Amended Complaint, will be vacated and the parties shall proceed to discovery as to all outstanding claims in accordance with the scheduling order they have proposed which I will adopt today in somewhat modified form.


*/s/ Douglas P. Woodlock*
DOUGLAS P. WOODLOCK
UNITED STATES DISTRICT JUDGE